## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## CLARKSBURG

**KAREN SUE REYNOLDS,**

          Plaintiff**,**

**v.**

          **CIVIL ACTION NO.: 1:16-CV-29 (KEELEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

          Defendant.

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On February 24, 2016, Plaintiff Karen Sue Reynolds ("Plaintiff"), by counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On May 3, 2016, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On June 2, 2016, and June 30, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II. <u>PROCEDURAL HISTORY</u>

On June 6, 2012, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on March 1, 2009 (later amended to April 1, 2011 by letter dated July 15, 2012). (R. 198). Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2016; therefore, Plaintiff must establish disability on or before this date. (R. 240). This claim was initially denied on August 29, 2012 (R. 68) and denied again upon reconsideration on 114 (R. 132). On November 1, 2012, Plaintiff filed a written request for a hearing (R. 146), which was held before United States Administrative Law Judge ("ALJ") Brian Wood on April 1, 2014 in Plaintiff appeared by video from Cumberland, Maryland; the ALJ presided over the hearing from Seven Fields, Pennsylvania. (R. 37). Plaintiff, represented by Ambria Adkins at the hearing, appeared and testified, as did Fred Monaco, Ph.D., an impartial vocational expert. <u>Id</u>. On May 23, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 14). On January 5, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III. <u>BACKGROUND</u>

### A. **Personal History**

Plaintiff was born on February 18, 1963, and was 49 years old at the time she filed her claim. (R. 198). She completed high school and has taken a few college courses at Eastern Community and Technical College (R. 234). Plaintiff's prior work experience included assistant

manager at Family Dollar, cashier at a convenience store, cook, front desk staff at a hotel, and nursing home aide. (R. 234). She was single at the time she filed her initial claim (R. 198) and was single at the time of the administrative hearing. (R. 37). As to dependent children, she has one (1) son listed on her application (R. 199), who she stated at the hearing was incarcerated at that time; and two (2) teenage daughters still living at home (R. 41). Plaintiff alleges disability based on congestive heart failure, rheumatoid arthritis, knots in arms and legs, and depression (R. 82).

**B.    Medical History**

Plaintiff's original application alleged an onset date of March 1, 2009. However, Plaintiff Later amended her alleged onset date to April 1, 2011 by letter dated July 15, 2012, titled "Motion to Amend Alleged Onset Date." (R. 210). Therefore, for the purposes of this analysis, the undersigned considers an alleged onset date of April 1, 2011.

**1.    Medical History Pre-Dating Alleged Onset Date of April 1, 2011**

On July 13, 2000, Plaintiff underwent an echocardiogram pursuant to post-partum cardiomyopathy. (R. 481). Interpretation of the results indicated severel global left ventricular dysfunction, moderate mitral regurgitation, and pleural effusions. Id. On December 29, 2000, a blood pool study was conducted, showing largely normal results with an ejection fraction of 59%. (R. 554). During this period, in March 2001, Plaintiff was also treated for gallbladder stones. (R. 541), which were treated via laparoscopic cholecystectomy. (R. 545). On June 20, 2003, Plaintiff followed up with Dr. Bonyak, who observed that her post-partum cardiomyopathy with severe left ventricular function had subsequently resolved. (R. 429). Dr. Bonyak's impression was that Plaintiff had experienced a "complete recovery."[1] Id.

---

[1] "She is doing better. She has had no symptoms of CHF. No palpitations, dizziness, lightheadedness or syncope. She had an echocard1ogram performed today and on preliminary review there is a sustained improvement with her e1ection fraction 1n the

On March 26, 2008, Plaintiff had a transthoracic echocardiogram completed at Grant Memorial Hospital. (R. 393). Jong K. Kim, M.D.'s impressions were:

> Mild global hypokinesis of the left ventricle with estimated LVEF of 50-55%. Diastolic compliance is normal.
> No significant aortic stenosis or regurgitation.
> Mild mitral regurgitations with associated prolapse.
> Mild tricuspid regurgitation.

Id. A chest X-ray also completed on March 26, 2008 showed "normal cardiac silhouette," hyperinflation, and scoliosis of the thoracolumbar spine. (R. 392). Dr. Kim's impression of the study was "chronic lung disease and hyperinflation without any evidence of superimposed acute process." Id. A computerized tomography (CT) of Plaintiff's brain completed on February 9, 2009 was normal; findings were unremarkable. (R. 394). Results of an electroencephalogram (EEG) on February 11, 2009 were also within the range of normal variation. (R. 395).

On February 3, 2010, an X-ray of Plaintiff's left forearm was within normal limits, showing unremarkable soft tissue, no evidence of significant degenerative or inflammatory change, and no evidence of acute fracture or dislocation. (R. 396). On February 3, 2010, an X-ray of Plaintiff's left hand showed a "small cortical bony excrescence along the distal radius along the radial styloid[,] likely representing [an] old avulsion injury." (R. 397). On July 10, 2010, another x-ray of Plaintiff's left hand was again normal. (R. 398).

On October 5, 2010, results of a sonogram of Plaintiff's left lower leg were normal with no abnormalities observed (R. 399). Results of an x-ray of plaintiff's left tibia and fibula that same day were also normal. (R. 400).

---

normal range. Her election fraction has been normalized since 12/00." Further, "[s]he is doing quite well with a normalized ejection fraction for the past three years. From my standpoint, she is doing well enough that she need only see me on an as-needed basis. At this point, I would continue her ACE inhibitor indefinitely She can probably come off the Aldactone or at least use it on a prn basis if she has some ankle swelling." (R. 429)

## 2. Medical History Post-Dating Alleged Onset Date of April 1, 2011

A "cardiolite stress" test on April 20, 2011 revealed no evidence of stress induced ischemia, a fixed perfusion defect involving the distal inferior wall, and left ventricular ejection fraction of 57%. (R. 401).

On September 6, 2012, Plaintiff complained of trouble sleeping at night. (R. 417). On November 6, 2012, Plaintiff complained of lower neck and thoracic pain following a motor vehicle accident in which she was struck from behind. (R. 416). X-rays were ordered, and Plaintiff was referred to a chiropractor. Id. On November 7, 2012, a series of x-rays were completed on Plaintiff's spine and ribs. An x-ray of Plaintiff's cervical spine showed moderate disc space narrowing at C5-6 level without any evidence of fracture or acute process. (R. 413). An x-ray of Plaintiff's thoracic spine showed moderate scoliosis without any evidence of fracture of acute process. (R. 414). An x-ray of Plaintiff's right ribs was normal, with no evidence of fracture, and unremarakable structures with no lytic or plastic changes. (R. 415).

Plaintiff began treatment at with Jack Ricci, D.C., at Moorefield Chiropractic on November 14, 2012. (R. 418). Impressions included whiplash, lumbar sprain/strain, thoracic sprain/strain, and radiculitis. Dr. Ricci recommended chiropractic manipulation and manual therapy, electrical muscle stimulation, and therapeutic exercises. (R. 419). Plaintiff followed up at Moorefield Chiropractic for the next few weeks, completing daily patient questionnaire reporting pain of 3 on a 1 – 10 scale on January 10, 2013 (R. 424), 2 out of 10 on January 15 (R. 422), January 17 (R. 423), and 22 (R. 421). By January 31, 2013, Plaintiff reported pain of 0 out of 10 (R. 420).

On November 19, 2013, Plaintiff was treated at Winchester Medical Center for left foot and ankle pain, and right hand pain. (R. 519). Imaging studies revealed mild soft tissue swelling

in Plaintiff's hand, but "no fracture, dislocation, or significant arthritic change" was observed. (R. 538). Imaging studies of Plaintiff's foot were normal. (R.539). She was given pain medication and Prednisone for arthritis and discharged in "good and stable" condition. (R. 530) Notes indicate that "at discharge, the patient's status had improved," initial pain rated at 8 out of 10 had resolved to 0 out of 10, and she left walking. (R. 522).

On December 3, 2013, Plaintiff was seen by her primary care provider, Dr. Thompson, complaining of sharp pain, lightheadedness, difficulty walking, and rheumatoid arthritis flare-ups. (R. 486). Dr. Thompson ordered labwork (blood tests), which were completed on December 4, 2013. (R. 493). On December 20, 2013, Plaintiff underwent a myocardial perfusion study pursuant to chest pain and shortness of breath at Winchester Cardiology & Vascular Medicine (R. 475). Dr. Brandon Barrett, M.D., and reviewing doctor Anne Kassira, M.D. concluded that the study revealed:

1.  Abnormal exercise treadmill tests with development of late 1 mm ST depression in the inferior leads during the recovery phase
2.  Unremarkable myocardial perfusion scan without evidence for infarct or ischemia
3.  Low-normal left ventricular systolic function with the calculated ejection fraction of 53% without regional wall motion abnormalities
4.  Integrating the above, although the exercise treadmill portion was abnormal, the patient's ability to achieve 10 METS as well as the unremarkable myocardial perfusion imaging would indicate that she has a good prognosis, and I would grade this as an abnormal but low-risk stress test result. No prior study available for comparison.

(R. 475-476). A transthoracic echocardiogram on December 20, 2013 likewise revealed "no clinically significant valvular abnormalities." (R. 478). A 24-hour Holter monitor study was also conducted pursuant to complaints of palpitations, which revealed rare premature ventricular and atrial contractions that correlated with one diary entry for chest pain. (R. 479). No pauses were noted, and no ventricular or atrial runs were noted. Id.

Plaintiff followed up with Dr. Kassira on January 13, 2014 for noneschemic cardiomyopathy. (R. 488). Primary complaints were noted as chronic cough and dyspnea on exertion with wheezing; review of systems was otherwise negative except for shortness of breath and sleeping on more than one pillow. (R. 489). Dr. Kassira noted that Plaintiff's symptomatic premature ventricular complexes were improved with Coreg medication, blood pressure was stable, no ischemia is present, ejection fraction had declined slightly since 2002. (R. 490). Dr. Kassira suspected COPD pursuant to tobacco use and chronic cough, and recommended a statin for cholesterol. Id. Spirometry testing on January 14, 2014 confirmed the diagnosis of COPD. (R. 498).

### 3. Medical Reports/Opinions

On July 31, 2012, Tracy Cosner-Shepherd, M.A., completed a Mental Status Examination (MSE) of Plaintiff. (R. 368). She observed that Plaintiff drove herself to the examination, exhibited normal psychomotor behavior, and had no difficulty ambulating. Id. Plaintiff reported being depressed, not feeling like leaving the house, difficulty sleeping, little appetite, low energy, crying spells, and memory/concentration problems. (R. 369). Plaintiff reported two isolated and sporadic treatment periods for depression: for "about a year" in 1995, and "about 6 months to a year" in 2001. Id. Plaintiff was cooperative, maintained good eye contact, gave appropriate responses, and exhibited a "neutral to pleasant" mood. (R. 370). Plaintiff exhibited relevant speech, normal and organized thought process, "fair to average" insight, and normal judgment. Id. She reported a fear of heights, and denied illusions, hallucinations, or suicidal/homicidal ideations. Id.

As to daily activities, Plaintiff reported she "sits around a lot unless she has homework." R. 371). Plaintiff goes to classes twice a week. Id. When her daughter is there, Plaintiff reports

that she goes swimming with her in the pool. Id. Plaintiff reports sometimes needing help with dressing and combing her hair; she cooks every day with help, and sometimes does laundry. Id. Plaintiff denied doing dishes, according to this report (although she testified at the hearing that she has a dishwasher and will load it sometimes). Id. Plaintiff reported that she does not do any yard work, and it is usually done by her son or neighbor, but also said she occasionally operates the riding mower. Id. She reported shopping for groceries once a week and driving a "couple" times per week. Id. She stated she "does not do any walking" and denied having hobbies or interests. Id. Plaintiff also denied social activities except for seeing friends at school or interacting with them on Facebook, and socializing occasionally with her neighbors. Id.

Psychologist Cosner-Shepherd ruled out Major Depression Disorder on a recurrent basis per Plaintiff's self-reported history, and her prognosis of Plaintiff was "fair." (R. 371). Plaintiff's persistence, pace, immediate memory, and remote memory were all within normal limits. (R. 371-372). Plaintiff's concentration was mildly deficient and her recent memory moderately deficient, based on her performance on assessments. Id.

On August 15, 2012, Stephen Nutter, M.D. at Tri-State Occupational Medicine completed a CE of Plaintiff. (R. 376). A physical examination revealed that vital signs, general systems, cardiovascular function, abdomen, hands, lower extremities, cervical spine, and neurological function was normal. Id. The abnormalities noted by Dr. Nutter included complaints of pain/tenderness in the back, right hip, and left wrist; as well as crepitus in the shoulders. (R. 378). No redness, warmth, swelling, or nodules were observed in Plaintiff's arms, hands, legs, or feet. Id. Dr. Nutter's impressions were:

5.    Degenerative arthritis and a history of rheumatoid arthritis.
6.    Chest pain with a history of congestive heart failure
7.    Shortness of breath, cause undetermined.
8.    Chronic cervical and lumbar strain.

(R. 379), and his report contained the following summary:

> SUMMARY: This is a 49-year-old female who complains of problems with joint pain. She had pain and tenderness in the right hip and left wrist and pain in the right shoulder. She had crepitus in both shoulders on range of motion testing. There is no evidence of rheumatoid arthritis. On physical exam, there are no rheumatoid nodules, capsular thickening, periarticular swelling or tophi. There is no ulnar deviation.
>
> The claimant reports problems with chest pain and a history of congestive heart failure. The history of chest pain is noted to show atypical character, however the rest of the history seems consistent with angina as pain can be brought on by exertion. This could possibly represent anginal chest pain until proven otherwise. There is no evidence of congestive heart failure. On physical exam, there is no S3 gallop, rales, or jugulovenous distention.
>
> The claimant reports problems with shortness of breath. The pulmonary examination is normal. The claimant was not short of breath with mild exertion or in the supine position. There is no clubbing or cyanosis. Pulmonary function studies today were normal.
>
> The claimant reports problems with her back and neck. She had pain and tenderness and decreased range of motion of the lumbar spine. Straight leg raise test was negative. Grip strength, fine manipulation skills, sensory and motor modalities were intact. There is no evidence of nerve root compression noted. Cervical spine exam was normal on today's visit.

(R. 380). A Ventilatory Function Report Form dated August 15, 2012 was also included from Tri-State Occupational. (R. 381). It indicated no evidence of bronchospasm or acute respiratory illness (R. 381).

The record indicates that agency reviewers considered a Consultative Examination completed by Gregory Trainor, MA on August 20, 2012. (R. 70). However, that CE report does not appear to be included in the record. See Court Transcript Index, ECF No. 7-1 at 1-3.

On August 20, 2012, Joseph A. Shaver, Ph.D. completed a psychiatric review technique (PRT) of Plaintiff (R. 75). Dr. Shaver opined that Plaintiff had no impairment in social functioning or episodes of decompensation, and only mild limitations in activities of daily living

and maintaining concentration, persistence, or pace. Id.  In support of those limitation findings,

Dr. Shaver provided the following additional explanation:

> MSE (7/31/12) rated concentration as only mildly impaired with immediate/remote memory, pace, persistence and social functioning as falling WNL Clmt fixes easy foods, loads dishwasher, does light laundry, vacuums, mows some grass, drives, shops and handles personal finances. It is believed that Clmt possesses the mental capacity to engage in gainful work-like activity on a sustained basis.

(R. 75). Dr. Shaver further opined that Plaintiff's statements of limitation of activities of daily

living appeared to be partially credible. Id. On September 18, 2012, Jeff Harlow Ph.D. conducted

another PRT and affirmed Dr. Shaver's conclusions, noting that the initial PRTF was

"AFFIRMED in light of an analysis of the file, which indicates that there is zero evidence of new

mental health treatment since the date of the initial assessment." (R. 98).

On August 28, 2012, Fulvio Franyutti, M.D. completed a physical residual functional

capacity (RFC) assessment. (R. 76). After reviewing all of Plaintiff's medical records, Dr.

Franyutti made the following conclusions on Plaintiff's exertional limitations: (1) occasionally

lift/carry twenty pounds; (2) frequently lift/carry ten pounds; (3) sit and stand/walk about six

hours in an eight-hour workday; and (4) unlimited pushing/pulling. (R. 76-77).   Dr. Franyutti

next opined as to Plaintiff's postural limitations that Plaintiff could occasionally climb ramps,

stairs, ladders, ropes, and scaffolds; and occasionally stoop, kneel, crouch, and crawl. (R. 77).

Dr. Franyutti noted no manipulative, visual or communicative limitations. Id. Plaintiff's

environmental limitations were (1) avoid concentrated exposure to extreme cold or heat, hazards,

and fumes, odors, dusts, gases, and poor ventilation. (R. 78). Dr. Franyutti opined that Plaintiff

had no limitations on exposure to wetness, humidity, and noise. Id. Pedro F. Lo, M.D.,

completed a reconsideration of the RFC on September 14, 2012, and affirmed Dr. Franyutti's

assessment as written as there was no additional medical evidence. (R. 101).

On March 19, 2014, Plaintiff's primary care provider, Stephen Thompson, M.D. completed a Residual Functional Capacity (RFC) Questionnaire. (R. 589). Dr. Thompson noted that for frequency of treatment, he saw Plaintiff "every 3-6 months," but did not indicate the length of the treatment relationship. Id. His diagnoses included 1) post-partum cardiomyopathy, 2) rheumatoid arthritis, 3) Vitamin B12 deficiency, 4) COPD / obstructive lung disease, and 5) hypertension. Id. His prognosis was "fair," indicating "problems are lifetime." Id. Symptoms included fatigue, "SOB / DOE," low exertional capabilities, and polyarthralgia. Id. Dr. Thompson noted that Plaintiff has "mild to severe" pain "depending on the day." Id. Clinical finding and objective signs cited included echocardiograms, specifically ejection fraction percentages, and "PFT" tests confirming obstructive lung disease (COPD), and joint swelling and pain for rheumatoid arthritis. Id. Dr. Thompson noted that Plaintiff took Altace for cardiomyopathy, which causes dizziness, and Prednisone for her arthritis which causes nausea and dizziness. Id. He noted a poor response to date, but that Plaintiff was still following with rheumatology. Id.

Dr. Thompson opined that Plaintiff's impairments were expected to last at least twelve months, and that Plaintiff was not a malingerer. (R. 590). He opined that depression contributes to Plaintiff's symptoms and functional limitations, and that her impairments are reasonably consistent with symptoms and functional limitations in the evaluation. Id. He reported that Plaintiff "states [she is] in constant pain." Id. He opined that Plaintiff was incapable of even low stress jobs, due to difficulty breathing, poor exertional capabilities, and chronic pain due to arthritis. (R. 590-591).

Dr. Thompson opined that Plaintiff could not walk one city block without rest or severe pain; that she could sit or stand for 15 minutes before needing to move, and that she could sit or

stand/walk for less than two hours in a given eight-hour workday. (R. 591). She would need to walk around every 20 – 30 minutes during an eight-hour workday, for 3 – 5 minutes at a time. (R. 591-592). She would need to take unscheduled breaks during an eight-hour workday, though he did not know how often or for how long. (R. 592). Plaintiff would not need to elevate her legs with prolonged sitting, nor would she need to use a cane or assistive device to walk. Id.

Dr. Thompson opined that Plaintiff could occasionally lift up to 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. (R. 593). She could occasionally look up or down, turn her head, or hold her head in a static position. Id. She could occasionally twist and climb stairs; rarely stoop/bend or crouch/squat, and never climb ladders. Id. She does not have significant limitations with reaching, handling, or fingering. Id. He opined that Plaintiff's impairments were likely to produce "good days" and "bad days," and estimated she would likely be absent from work more than four days per month as a result of her impairments. Id. She could not tolerate temperature extremes, wetness, humidity, noise, dust, fumes, gases or hazards due to COPD. (R. 594). Dr. Thompson opined that Plaintiff is not capable of working a full-time work schedule at any level of exertion. Id.

C.     **Testimonial Evidence**

At the ALJ hearing held on April 1, 2014, Plaintiff testified that her date of birth was February 18, 1963. (R. 40). Plaintiff was 5'2" and approximately 136 pounds. Id. Plaintiff was currently single; she has two (2) teenage daughters still living at home, ages thirteen (13) and seventeen (17). (R. 41). Plaintiff's sole current source of income is child support. Id. Plaintiff has a driver's license and drives "maybe two or three times a week" – "to the jail to see [her] son," and "to a college class." (R. 42).

Plaintiff next testified as to her prior work history. She last worked – she thought – in October 2011. (R. 43). She worked for a short period of time at the South Branch Inn where she staffed the front desk, took reservations, and did some laundry. Id. In this job, she had to stand "most of the time," and lift about twenty (20) pounds. (R. 44). The ALJ asked Plaintiff why she left this job after just one week; Plaintiff stated "I just couldn't do it," elaborating upon the ALJ's request that "[t]hey just told me that I needed to speed up, because I was too slow, and I couldn't work the computer fast enough." Id. Prior to that, she worked a cafeteria as a cook. Id. This job required her to lift big pots of food, lift "about 15, 20 pounds," and clean. (R. 45). Plaintiff advised that she was "basically" fired from this job for reasons unspecified when "he told me that he wanted his keys back. Never gave me a reason." Id. Plaintiff said she thought she was doing the cooking "okay," but suspected she was asked to turn in her keys because she couldn't do the lifting, and because of scheduling conflicts. Id. Prior to this, she worked as a nursing home aide at Grant County Nursing Home, where she performed small tasks and lifted about twenty (20) pounds. Id. She also worked as a cashier in a convenience store, and as an assistant manager at Family Dollar. Id. Prior to 1999, she worked at the chicken factory, though she was unsure of the exact dates. (R. 46).

Plaintiff further testified regarding her impairments, including arthritis, heart trouble, cardio obstructive pulmonary disease (COPD), a cyst on her liver, and knots and swelling in her extremities. (R. 47). Plaintiff testified that her arthritis affects her most in her hands, legs, and feet. Id. It flares up usually two or three times a week, and the flares are unconnected to anything she does, and unaffected by heat or cold. Id. Plaintiff is prescribed prednisone for her arthritis, but that it does not work most of the time, only sometimes. Id. She also takes Tylenol. (R. 48).

When she experiences a flare, Plaintiff reports that her fingers swell, and she gets knots

in the back of her hands. Id. During these flares, her hands hurt so badly that she can't use them; instead of typing normally, using and moving all of her fingers, Plaintiff reports instead typing with one stationary finger. (R. 49). She can usually use a knife and fork, sometimes hold a glass of water, and sometimes button buttons. Id. When she has difficulty with these tasks, her children help her fasten her clothing. Id. Arthritis flares also affect her feet and back. Id. She gets knots underneath the arch of her feet and on her heels, and "can't hardly walk." Id. Plaintiff reports that she has not been referred to a rheumatologist for her arthritis. (R. 50). She reports having been prescribed prescription medication for her arthritis, but was allergic to it, so her medication is limited to Tylenol. Id.

Plaintiff testified that "deterioration" in her neck and back sometimes causes her neck to hurt, and more frequently, her back, usually at night. (R. 51). Plaintiff testified that her COPD causes significant difficulty breathing when walking more than about 500 yards or being around strong smells. Id. She reported recently having been started on an inhaler, which helps. (R. 52). Plaintiff also testified as to heart problems that she has chest pain, palpitations, dizziness, and fainting episodes. (R. 53-54). She reported three or four episodes like that the previous year, but she was prescribed two medications ("Altace" and "either Lortab or Cloric [sic]") that have helped, as she has not passed out since starting them. (R. 54). She used to go into a seizure when she passed out, but noted that that, too, has ceased. Id.

Her high blood pressure causes her to get bad headaches three or four times a week, that last "all day, unless [she] takes like Tylenol." (R. 55). Plaintiff testified that "most of the time," Tylenol does not work, though it works "sometimes." Id. Plaintiff's acid reflux disease causes her chest to burn "all the time;" she was prescribed Prilosec, which she reports has helped. (R.

56). Plaintiff also reported that once in a while, the cyst on her liver will cause pain underneath her ribs, but largely does not bother her. <u>Id</u>.

Plaintiff also testified regarding her daily activities. She reports a typical day for her is spent watching television. (R. 56). Sometimes, when her hands are not hurting, she will sew, do laundry, household chores, and cook; she has a dishwasher, and therefore does not have to wash dishes by hand. (R. 57). Plaintiff reports that "anything else" is usually done by her daughters. <u>Id</u>. The transcript of the hearing read as follows:

Q       All right. And, do you stop for groceries?
A       You go out to restaurants or anything like that?
Q       No.
A       Do you visit with friends?
A       Family once in a while.

Presumably, Plaintiff was asked if she *shops* for groceries, and her response, if she gave one, appears to have been omitted from the transcript. Also presumably, the "Q" and "A" labels on these lines are also transposed or out of order.

Plaintiff does not do yard work; her sons help with shoveling snow and other yard work, whereas her daughter usually does the mowing. <u>Id</u>. Plaintiff last mowed the grass using a riding mower back "in the early summer." (R. 58).

Plaintiff testified that she gets along with others okay. (R. 57). The ALJ next inquired about depression, which Plaintiff had not mentioned yet. Plaintiff stated that she was not seeing anyone for depression, and was likewise not taking any medications for it. (R. 58). Plaintiff's depression affects her by not wanting to leave her house or be around people. <u>Id</u>.

Plaintiff's attorney then asked Plaintiff additional questions to clarify her testimony to the ALJ. Plaintiff reported that the medication she takes does help with pain, but that it frequently makes her sleepy, and occasionally makes her dizzy. (R. 59). She does not take naps during the

day. Id. As to household chores, although Plaintiff does so some chores when she is not in a lot of pain, she does them "very slowly[, b]ecause it affects my breathing . . . if I'm not in so much pain, I can do it like at a regular pace, but sometimes, it'll make me to where I can't hardly breathe." Id.

**D.      Vocational Evidence**

Also testifying at the hearing was Fred Monaco, Ph.D., a vocational expert (spelled phonetically throughout the transcript as "Brendon Monica" or "Dr. Monica"). (R. 37).  Dr. Monaco characterized Plaintiff's past work for the previous fifteen (15) years. (R 61). Plaintiff's former job as assistant manager of Family Dollar was classified as semiskilled, medium work, with a specific vocational preparation (SVP) of 3. (R. 62). Plaintiff's former job as cashier at a convenience store was classified as semiskilled, light work, with no SVP given. Id. Plaintiff's former job as a front desk clerk was "probably" unskilled, light work, with an SVP of 4. Id. Plaintiff's former job as a general duty aid for a nursing home was classified as unskilled, light work, with no SVP given. Id.

With regards to Plaintiff's ability to return to her prior work, Dr. Monaco gave the following responses to the ALJ's hypothetical:

> Q:      Please assume an individual the claimant's age, education, and work experience, and that the person can lift and carry 20 pounds occasionally, 10 pounds frequently, she can stand or walk for six hours out of an eight hour work day. She can sit for six hours of an eight hour work day. She'd be required to sit or stand up to 30 minutes [phonetic]. She can never climb ladders, ropes, scaffolds, can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can frequently handle and finger bilateral upper extremities. She must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation, as well as extreme heat and humidity. She must avoid all exposure to hazards, such as heights and dangerous machinery [phonetic]. She is able to perform simple, routine, repetitive tasks, and requires low stress work defined as anything simple [INAUDIBLE] and occasional change in work setting. She can have occasional interaction with coworkers and supervisors, and no interaction with the public. Would she be able to perform the past work you described?

A:     No.

(R. 62-63).

Incorporating the above hypothetical, the ALJ then questioned Dr. Monaco regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels.

Q:     Are there other jobs in the national economy such a person could perform?

A:     Your honor, there would be jobs in the national economy to accommodate your hypothetical. Representative sample one would be unarmed guard –

ATTY: I'm sorry, what was that doctor?

VE:    Unarmed guards. Individuals monitoring TV screens or sound for listening devices. In the light category, they're also described checking the various stations. I would remove approximately one fourth of the positions based on the factors related to cleaning and dust and so on.  So that would mean there are approximately 990,000
light positions in the national economy. Second representative sample would be hand packagers, individual packing items that are unable to be packed by machinery. It'd be approximately 470,000 light positions in the national economy. Third representative sample would be machine feeder and off bearer. And there are approximately 87,000 light positions in the national economy.

Finally, the ALJ questioned Dr. Monaco about Plaintiff's ability to work if she is completely credible as to the severity of her condition:

Q:     If we reduce the exertional category sedentary, would there be work available?
A:     The positions I testified to in response to your first hypothetical, your honor, would be appropriate for the second. Of course, the numbers would vary. Also, unarmed guards in the sedentary category, according to the Dictionary of Occupational Titles, are considered surveillance system monitors. There are approximately 95,000 sedentary positions in the national economy. Numbers for hand packers would change for approximately 26,000 sedentary positions in the national economy. And machine feeders and off-bearers would change to approximately 47,000 sedentary positions.
Q:     If she were off task 20 percent of the work day, would there be work available?
A:     No, your honor.

(R. 64).  Plaintiff's attorney then questioned Dr. Monaco:

Q:      Dr. Monica [sic], if the hypothetical person were limited to sitting, standing and walking, each one less than two hours in a work day, so sit less than two hours, stand less than two hours, and walk less than two hours, would they be able to maintain employment?

A:      According to Social Security regulations, no.

Q:      One second. And, going back to the previous hypothetical one, with the sit/stand option every 30 minutes, if I were to further define that as every 30 minutes needed the opportunity to stand and walk for three to five minutes, would they be able to maintain unskilled employment?

A:      Walking away from the work station?

Q:      Yes.

A:      No.

Q:      And if the hypothetical person were absent from work, or absent for a full day or missed half a day due to coming in late or leaving early, up to four times a month, would they be able to maintain employment?

A:      No.

(R. 65).

## E.      Work History and Disability Reports

### 9.      Work History Report

Plaintiff completed a work history report dated July 12, 2012. In the report, Plaintiff reported her last employment was with South Branch Inn as a front desk clerk. (R. 253). Plaintiff worked there for approximately one week, and listed her reason for stopping working as "[her] physical and/or mental condition." (R. 256).

### 10.      Disability Reports

An undated disability report listed Plaintiff's work history and medications, contained basic medical provider information, and noted the following:

"Congestive Heart Failure, Severe Rheumatoid Arthritis, SOB, knots in arms & legs, difficulty walking and using arms, depression, pain, fatigue, had to use crutches to get around when RA flares up, sometimes cannot drive b/c it is standard, due to pain she will pass out and go into convulsions."

(R. 239).

Subsequently, on July 16, 2012, disability examiner Lorie Posey mailed Plaintiff an adult seizure form to complete and return, which Plaintiff did, though she did not date the form. (R. 260). Plaintiff reported that she feels normal prior to a seizure. Id. During a seizure, "voices or sounds seem far away, everything turns black, think I bit my tonge [sic], wet myself." (R. 261). After a seizure, Plaintiff reported feeling "very tired and sleepy, weak, hurting from falling, dizzy." (R. 262). Plaintiff reported her most recent seizure occurred on May 13, 2012, with her second most recent seizure occurring on February 4, 2009. Id. Though Plaintiff was provided space to list more seizures, she listed only these two.

A disability report dated September 11, 2012, was largely blank except for the following comments in the "Remarks" Section 10:

Dr. Thompson Altace - Blood Pressure - Dizziness Aspirin - Blood Thinner Naproxen - Rheumatoid Arthritis – Upset Stomach Methylprednisolone - Rheumatoid Arthritis*.

(R. 266).

A fifth disability report was dated November 1, 2012. This report listed the following changes since the prior disability report. Beginning October 1, 2012: (1) "arthritis is getting worse," and "more depressed." (R. 270). Plaintiff further indicated she was "unable to use [her] right hand," "personal tasks take longer to complete," "cannot bend fingers," and "difficulty walking." (R. 272). Remarks included:

Dr. Thompson Altace - Blood Pressure - Dizziness Medrol - Rheumatoid Arthritis - Weight Gain Aspirin – Blood Thinner*

(R. 273).

Also included with these other reports from Plaintiff was an undated "Claimant's Medications" form. (R. 288). On this form, Plaintiff reported taking Carvedilol and Ramipril for

her heart; Prednisone for arthritis; Lipitor for cholesterol; Prilosec for heartburn; and Klor-con for low potassium. Id.

**F.      Lifestyle Evidence**

On an Adult Function Report dated July 8, 2012, Plaintiff reported that her conditions limit her ability to work because she experiences frequent pain: "Sometimes my knees or shoulders hurt so bad I can't walk to raise my arms, my ankles of hands hurt and swell so bad I can't use them." (R. 243). When describing her typical day, Plaintiff stated that she does homework, goes to classes, watches tv, washes clothes, and sometimes tries to mow or accompany her daughter in the pool. (R. 244).

She cares for her children, including laundry, meals, getting them up for school and taking them to the bus stop; Plaintiff's children help her care for their pet dogs. Id. Plaintiff reported no limitations on her activities prior to the onset of her conditions. Id. Now, she reports problems dressing and doing her hair because she sometimes cannot raise her arms or use her hands, and has her daughters help her. Id. She sometimes can't sit in the tub and, on those occasions, showers instead. Id. She reports no problems using the toilet. Id. Plaintiff can sometimes feed herself; other times, she eats soup when she cannot use her hands. (R. 244). She can make soups, pot pies, sandwiches, and toast. (R. 245). Usually, she prepares meals twice a day, with the help of her daughters. Id.

As to housework, Plaintiff puts dishes in her dishwasher, washes clothes, cleans a little, dusts, vacuums, and mows a little. (R. 245). She does these things for "about an hour," weekly or biweekly. Id. She reports that her children and neighbors help with mowing and weedeating, because sometimes she can't breathe outside if it's too hot or cold, and she is afraid of having a seizure while on the mower. Id. Plaintiff typically goes outside once or twice daily, "only if [she

has to]." (R. 246). Plaintiff shops at the grocery store for one hour weekly. Id. She reports being able to pay bills, count change, handle a savings account, and use a checkbook. Id.

Plaintiff's hobbies and interests include watching tv, reading, cooking, playing with kids and animals, swimming, riding bikes; she does these things daily, or tries to, but notes her sight and mobility are getting worse. (R. 247). She next noted that she does not ride a bike at all any longer. Id. Plaintiff reports that she occasionally talks to others on the phone, sees people out at the store, or classmates at school. Id. Places she goes on a regular basis include to her mother's house, or to school. Id. Plaintiff reported having classes two days a week, and missing only one class that summer. Id. Plaintiff reported getting along well with others (R. 248), and getting along "great" with authority figures. (R. 249). She has never been fired of laid off form a job because of problems getting along with other people. Id.

Plaintiff reports that her conditions affect her ability to lift, squat, bend, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands. (R. 248). She elaborated that she sometimes uses the elevator at school when her legs hurt badly. Id. Plaintiff can walk "maybe 200 to 300 yards" before needing to stop and rest, and must rest for about fifteen minutes before her breath returns and her heart slows back down. Id. She reported being able to pay attention for about 45 minutes, following written instructions "very well," and following spoken instructions well most of the time. Id. Plaintiff reported sometimes handling stress well, but "most of the time I can't set [sic] and cry or go to bed." Id. She handles changes in routine relatively well, on the other hand. Id. Plaintiff reported using a brace for her hand "quite often," and crutches "once or twice a month." Id. As to medications, Plaintiff took Altace which caused dizziness and blurred vision, as well as Naproxen which caused stomach pain and sweating. (R. 250).

# IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since April 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.).*

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine; scoliosis of the thoracic spine; chronic cervical and lumbar strain; chronic obstructive pulmonary disease; cardiomyopathy; premature ventricular complex; hypertension; gastro esophageal reflux disease; history of syncope; poly-articular arthritis; rheumatoid arthritis; headaches; and a depressive disorder (20 CFR 404.1520(c) and 416.920( c) ).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can lift and carry 20 pounds occasionally and 10 pounds frequently. She can stand or walk for 6 hours of an 8-hour workday and can sit for 6 hours of an 8-hour workday. She requires a sit/stand option every 30 minutes. She can never climb ladders, ropes and scaffolds, but can occasionally climb ramps and stairs. She can occasionally balance, stoop, kneel, crouch and crawl and she can frequently handle and finger with the bilateral upper extremities. She must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, extreme heat and humidity. She must avoid all exposure to hazards, such as heights and moving machinery. She is able to perform simple, routine, repetitive tasks, but requires low stress work defined as occasional simple decision making and occasional changes in the work setting. She can have occasional interaction with co-workers and supervisors, but no interaction with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 18, 1963 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 16-31).

# VI.     DISCUSSION

## A.     Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff,

307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contentions of the Parties**

Plaintiff, in her Motion for Judgment on the Pleadings, asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

1. The ALJ failed to comply with 20 C.F.R. §§ 404.1527 and 416.927 in assigning "little weight" to the opinion of treating physician Stephen Thompson, D.O.

2. The ALJ's credibility determination was deficient, rendering his decision unsupported by substantial evidence.

(Pl.'s Br. in Supp. of Mot. for J. on the Pleadings at 9, ECF No. 10). Plaintiff asks the Court to "remand[] for correction of the[se] errors." (Id. at 19).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No. 11). Specifically, Defendant alleges that both the weight given by the ALJ to Dr. Thompson's opinion and the ALJ's credibility assessment are supported by substantial evidence. (Def.'s Mem. in Supp. Of Def.'s Mot. for Summ. J., ECF No. 12).

**C.      Analysis of the Administrative Law Judge's Decision**

**1.  Weight Afforded by the ALJ to Treating Physician**

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

*How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:

(1) *Examining relationship.*  Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will

look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be generally be accorded great weight because they "reflect[] an expert judgment based on a continuing

observation of the patient's condition over a prolonged period of time." <u>Mitchell v. Schweiker</u>, 699 F.2d 185, 187 (4th Cir. 1983). In <u>Craig v. Chater</u>, however, the Fourth Circuit further elaborated on this rule:

> Circuit precedent does not *require* that a treating physician's testimony "be given controlling weight." <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) *and* 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." <u>DeLoatch v. Heckler</u>, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." <u>See</u> <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Arnold v. Sec'y of Health, Ed. & Welfare</u>, 567 F.2d 258, 259 (4th Cir. 1977) (quoting <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974)).

Plaintiff argues that the ALJ "committed reversible error in failing to accord proper weight and to provide 'good reasons' for rejecting the opinion of Ms. Reynold's treating

physician." ECF No. 10 at 14. Specifically, Plaintiff argues that "the ALJ did not even state what parts of the record he found to be inconsistent with Dr. Thompson's opinion; the rationale for his decision is conclusory" and "does not constitute a 'good reason' for rejecting a treating source opinion." Id. at 13-14. The undersigned disagrees.

The Fourth Circuit recently addressed an ALJ's obligation pursuant to SSR 96-2p in Sharp v. Colvin, No. 15-1578, 2016 WL 6677633 (4th Cir. 2016). An ALJ has met his obligation if he provides a "specific reason that is sufficient to afford [meaningful] appellate review." Id. at *5. An explanation that "relie[s] on and identifie[s] a particular category of evidence" can suffice; a failure to cite specific pages in the record will not render an explanation "conclusory" so long as enough information is provided to permit meaningful appellate review. Id. Further, when the record contains substantial evidence supporting the ALJ's opinion and explanation, that opinion will not be reweighed by the Court. Id.

Here, the ALJ's opinion is likewise sufficient and supported by substantial evidence. The ALJ afforded little weight to treating osteopathic physician Thompson's opinion because it was "not supported by the evidence of record, including objective medical findings and good activities of daily living." (R. 29). The ALJ determined rather that the "treatment records, objective medical findings, mental status examination findings, and persuasive medical opinion evidence" supported the residual functional capacity in his opinion. Id. A careful review of the record reveals that the ALJ's opinion is supported by substantial evidence (or, more accurately, a substantial lack of evidence). Nonetheless, the ALJ has significant support from the "particular category of evidence" he "relied on and identified." Sharp at *5.

### a. Dr. Thompson's opinion

Dr. Thompson's responses on the RFC Questionnaire present a number of problematic

statements. First, his prognosis of Plaintiff was listed as "fair," which is puzzling, since the majority of his conclusions on the RFC are less optimistic. (R. 589). However, the objective medical evidence of record actually does support a fair – or better – prognosis.

When asked to identify the "clinical findings and objective signs" supporting the Plaintiff's allegations of pain, Dr. Thompson cited the fact that Plaintiff's ejection fraction reported by echocardiograms "was 10% - now 50%." (R. 589). The undersigned is unable to ascertain the logic of that citation, given that those statistics indicate that Plaintiff's cardiomyopathy has *improved* significantly – which, of course, it has, according to the medical evidence of record. Dr. Bonyak's treatment notes indicate that Plaintiff had a significant bout with cardiomyopathy in 2000, but that by 2003, she had made a "complete recovery." (R. 429). Thus, Dr. Thompson cited the fact that Plaintiff's low ejection fraction over a decade ago, long since resolved, is a basis for her *current* pain. If there is any logic to this assertion, the undersigned cannot intuit what it might be.

Further, as the Plaintiff correctly observes, as a treating physician, Dr. Thompson was indeed well-versed in Plaintiff's medical history:

> The record is replete with Dr. Thompson's treatment notes over the years (Tr 416-419, 420-424, 484-498), results of testing he had ordered (Tr. 346-367, 342-345, 392-415,583-584, and letters/reports from specialists to whom he had referred Ms. Reynolds (Tr. 425-483, 585-588). Dr. Thompson was very familiar with Ms. Reynolds' diagnoses, her symptoms, her test results, the medications she took, every other aspect of her medical treatment and even her lifestyle.

Indeed, Dr. Bonyak's notes in 2003 referencing Plaintiff's "complete recovery" were carbon copied to Dr. Thompson, with the included note: "Dr. Thompson, thanks for allowing me to be involved in Ms. Reynold's care. Please feel free to contact me if any problems arise in the future." Id. Dr. Thompson was also privy to Dr. Kassira's treatment of and tests on the Plaintiff which showed a review of ejection fractions since Dr. Bonyak had declared her cardiomyopathy

"completely resolved," which showed that even her most recent ejection fraction was 50%.[2] Under such great familiarity, it is even more inexplicable why these ejection fractions would be cited to suggest that cardiomyopathy is a current significant condition for Plaintiff or a cause of current pain. Not only is that conclusion simply not supported by the objective medical evidence of record, it is directly opposite and conflicting.

Dr. Thompson noted that Plaintiff had a "poor response to date" for prednisone, but that she was "still following [with] rheumatology." (R. 589). At the hearing on April 1, 2014, Plaintiff, on the other hand, testified – as the ALJ observed - that she "has not seen a rheumatologist" (R.24):

| | |
|---|---|
| Q | Okay, and who's helping you with your arthritis? |
| A | Dr. Thompson. |
| Q | Okay. And, is he your primary care doctor? |
| A | Yes. |
| Q | Okay. So, what's he doing for you? |
| A | He's the one that put me on the prednisone for it. |
| Q | Okay. Have you ever seen a rheumatologist or anybody? |
| A | No, he's never sent me to one. |
| Q | Okay. Have you talked about that at all? |
| A | We talked about it, and I was seeing a therapist there for my back. It's back, I think October of 2011, I was having therapy on my back. |

(R. 50). The RFC was dated March 19, 2014 – almost two weeks before Plaintiff's hearing – ruling out the possibility that Plaintiff had begun seeing a rheumatologist after the hearing, but prior to completion of the RFC. (R. 594). Obviously, both cannot be true; either the Plaintiff is not credible, or the opinion of Dr. Thompson should not be afforded much weight. However, the record does not seem to contain any discernible record of treatment by a rheumatologist.

Dr. Thompson opined that Plaintiff would need to take unscheduled breaks during an eight hour workday, but when asked how often or how long he thought those breaks might be

---

[2] Generally, an ejection fraction of 50% is considered either normal or just slightly less than normal, and is in no case considered low.

needed, wrote "unknown." (R. 592). He further wrote that Plaintiff could not walk even a single city block without rest or severe pain. (R. 591). Yet, he also opined that Plaintiff would need "periods of walking around," and must walk every twenty to thirty (20-30) minutes during an eight-hour work day. (R. 591). Dr. Thompson opined that Plaintiff could sit or stand for a maximum of only 15 minutes before needing to move around. Id.

It is unclear how it would be possible to comply with all of his directives, especially where they conflict with each other. That is, after observing that Plaintiff cannot walk *any* distance without rest or pain, Dr. Thompson notes Plaintiff's need to walk around every twenty to thirty minutes. After stating he has no estimate as to how often breaks might be needed, Dr. Thompson notes Plaintiff's need to go for walks every twenty to thirty minutes.

On the other hand, Dr. Thompson surprisingly opined that Plaintiff had *no* significant limitations with reaching, handling, or fingering (R. 593) – an unexpected opinion to have about *this* Plaintiff, who herself testified that during an arthritic flare, her hands "hurt so bad, [she] can't use them." (R. 48). Plaintiff testified that arthritis in her hands renders her incapable of dressing herself, combing her hair, or typing, and that these flares occur 2-3 times per week. Id. Clearly, either the Plaintiff is not credible, or the opinion of Dr. Thompson should not be afforded much weight.

It is also worth noting that this record is comprised *primarily* of unremarkable findings and normal results. Were it not for page 343 in the record - the positive lab test for rheumatoid arthritis on April 11, 2011 – it is doubtful whether Plaintiff would have even established the existence of rheumatoid arthritis, considering the following:

> 1.    On February 3, 2010, an X-ray of Plaintiff's left forearm was *within normal limits*, showing *unremarkable soft tissue*, *no evidence of significant degenerative or inflammatory change*.

2. On October 5, 2010, results of a sonogram and x-ray of Plaintiff's left leg were both *normal*.

3. On August 15, 2012: "There is *no evidence of rheumatoid arthritis*. On physical exam, there are *no rheumatoid nodules, capsular thickening, periarticular swelling or tophi*. There is no ulnar deviation." (R 380).

4. On November 19, 2013, although Plaintiff was treated for arthritis, imaging studies of her left leg revealed only *mild soft tissue swelling* and *no significant arthritic change*; imaging studies of her foot were *normal*.

Under these circumstances and this record, it is not entirely clear that the arthritis Plaintiff does have nonetheless *could* reasonably be expected to cause Plaintiff's subjective symptoms. The medical evidence suggests that it has barely progressed, if at all, with no significant degenerative, inflammatory, or arthritic change apparently ever having been observed.

Further, although Plaintiff does suffer from COPD, the evidence of record also shows that at testing, the use of an inhaler ("inhaled bronchodilators") provided "statistically significant improvement" in her FEV. (R. 498). Plaintiff herself also confirmed at the hearing on April 1, 2014 that she had just started using an inhaler which was indeed improving her COPD symptoms:

Q    All right. And does the inhaler help? Does that work?
A    Yeah. I haven't been on it except for like a week, but it's helping.

Therefore, according to the Plaintiff, Dr. Thompson's assessment of the effects of her COPD is overly pessimistic and certainly premature, as she is apparently managing it better with the use of an inhaler. Further, her testimony at the hearing is that she started treatment – using an inhaler – a week before the hearing, and thus *after* Dr. Thompson completed the RFC. Therefore, his opinion as to her exertional capabilities due to COPD at best reflect her state prior to commencing use of an inhaler.

Under these circumstances, no rational reviewer would afford Dr. Thompson's opinions on the RFC significant weight given the aforementioned portions that are illogical, internally

consistent, and externally inconsistent with the objective medical evidence of record and/or Plaintiff's own testimony. Thus, not only is the ALJ's decision to afford little weight to Dr. Thompson's opinion supported by substantial evidence, his explanation was easily sufficient to permit meaningful review. There is no reversible error here.

### 2. The ALJ's Credibility Determination

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[3] capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96–7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

> 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996).

The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to

---

[3] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 49). Thus, the Court addresses only Step Two.

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

The ALJ did erroneously find that the Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were inconsistent with the residual functional capacity assessment. See Mascio v. Colvin, 780 F.3d 632 at 639 (4th Cir. 2015). However, so long as other valid grounds support the ALJ's reasoning, such error is harmless and not reversible. Id. at *6. Here, such other grounds exist. The ALJ *fully* explained why the medical records did not support Plaintiff's claims:

> The medical and other factors in this case do not support claimant's testimony. For example, the claimant alleges numerous physical impairments as well as depression, but disability is not documented. The claimant testified that she has hypetension hut Dr. Thompson noted that her hypertension was well controlled (Exhibits C-5F and C-1 OF). The claimant complained of chest pain but cardiolite stress test showed no evidence of stress induced ischemia and there was no evidence of congestive heart failure (Exhibits C-5F, C-7F, and C-lOF). The Holter Report, echocardiogram, and myocardial perfusion study were essentially normal and unremarkable (Exhibits C-13F and C-14F). The claimant complained of shortness of breath, hut pulmonary examination was normal and pulmonary function tests were normal (Exhibit C-7F). She complained of joint pain, hut there was no evidence of rheumatoid arthritis on physical examination. She complained of back, neck, hand and foot pain, hut physical examination revealed straight leg raise was negative, and grip strength, fine manipulation skills, and sensory and motor modalities were intact. There was no evidence of nerve root compression and cervical spine examination was normal (Exhibit C-7F). X-rays of the cervical spine revealed moderate disc space narrowing at C5-6 level without any evidence

of fracture or acute process. X-rays of the thoracic spine showed scoliosis without any evidence of fracture or acute process and x-rays of the ribs were normal (Exhibit C-lOF). X-rays of the hand revealed mild soft tissue swelling without acute hone pathology and x-rays of the foot were normal (Exhibit C-16F). The claimant testified that she suffers from depression. However, a mental status examination was essentially normal and unremarkable. Her concentration was mildly deficient based on her ability to calculate serial threes, but persistence and pace were within normal limits, immediate and remote memory were normal, and she was attending community college (Exhibit C-6F).

(R. 28). These are good reasons, with which the undersigned concurs. If there is medical evidence that would support Plaintiff's claims, it is largely absent from this record, at least.

As to the 96–7p factors, the ALJ found Plaintiff's daily activities (along with the objective medical evidence of record) to conflict with Plaintiff's subjective complaints regarding the intensity, persistence, and limiting effects of those symptoms (R. 27-28). The ALJ explained why activities of daily living were not limited to the degree expected, assuming Plaintiff's claims were accurate:

In addition, claimant's daily activities are not limited to the degree expected if her testimony regarding her functional limitations was accurate. The claimant testified that she takes care of her personal needs. She stated that she has a driver's license and drives and takes college classes online and at the community college. Additionally, she testified that she watches television, sews, does the laundry, performs household chores, prepares meals, grocery shops and reads. Considering all these factors, and the adverse medical opinions of Drs. Franyutti, Lo, Shaver, and Harlow, the claimant's testimony was not credible.

(R. 28).

The undersigned makes some additional observations. Plaintiff testified that 2-3 times per week, she could not use her hands because they hurt so much. (R. 48). She stated on her Adult Function Report that she sometimes "can't raise [her] arms or use [her hands]. (R. 244). On the other hand, Plaintiff also testified that she drives multiple times per week – to class, to grocery shop, to visit her son. On her Adult Function Report, Plaintiff stated that she had only missed one single class that summer. (R. 247). The undersigned cannot reconcile both the Plaintiff's statements of intensity and frequency of her symptoms with the use of her arms and hands, including gripping and turning a steering wheel, to drive multiple times per week, as the

evidence and her testimony shows that she regularly does - and she has only missed one class out of a summer semester. Certainly, that would also suggest that it may not be reasonable to anticipate that Plaintiff would be absent from or miss work up to four times per month. (R. 65).

Additionally, Plaintiff testified that her COPD causes her great difficulty, including that "[i]f [she] gets around strong smells or anything, [she] just can't hardly breathe." (R. 51). As of the most recent evidence in the record, however, Plaintiff still smokes three cigarettes per day. (R. 52).

Thus, the ALJ's error with respect to the RFC basis was harmless, since his conclusion was sufficiently supported by other substantial evidence, and it was sufficiently explained to permit the undersigned to meaningfully review and concur.

Plaintiff also quit her most recent employment after one week, which per her own testimony appears to have been motivated by in part by inconvenience:

Q      Okay. All right, and why did you leave this work after one week?
A      I just couldn't do it, and they told me that I needed to speed up, and it was interfering with my kids plus my college classes.

(R. 44). Notably, Plaintiff was not fired from this employment due to her slow pace. She was simply told, she reports, that she would need to work faster, and then promptly left of her own volition Considering the record as a whole, quite the opposite of what Plaintiff alleges, the ALJ appears to have been somewhat generous in his assessment of Plaintiff's disability as documented in the record.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) be **DENIED**, Defendant's Motion for Summary

Judgment (ECF No. 11) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted January 25, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE